IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL TAIT, et al., | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. 08-3083 |
| v. | ) | |
| | ) | |
| CITY OF PHILADELPHIA, | ) | |
| | ) | |
|     Defendant. | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

LEVINE SULLIVAN KOCH
  & SCHULZ, L.L.P.
Gayle C. Sproul (I.D. No. 38833)
Michael Berry (I.D. No. 86351)
2112 Walnut Street, Third Floor
Philadelphia, PA 19103
Tel: (215) 988-9778
Fax: (215) 988-9750
Email: gsproul@lskslaw.com,
mberry@lskslaw.com
*Local Counsel for Plaintiffs*

INSTITUTE FOR JUSTICE
William H. Mellor (DC Bar No. 462072)*
Robert J. McNamara (VA Bar No. 73208)*
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: wmellor@ij.org; rmcnamara@ij.org
*Admitted *Pro Hac Vice*
*Counsel for Plaintiffs*

## **TABLE OF CONTENTS**

**Page**

**TABLE OF AUTHORITIES** ......................................................................................................... ii

**INTRODUCTION** ......................................................................................................................... 1

**FACTUAL BACKGROUND** ....................................................................................................... 1

**ARGUMENT** ................................................................................................................................. 3

    I.      PHILADELPHIA'S TOUR-GUIDE LICENSING SCHEME IS AN UNCONSTITUTIONAL CONTENT-BASED RESTRICTION ON SPEECH. ................................................................................................................... 4

          A.      The Licensing Law Is Content-Based. ........................................................... 4

          B.      The Law Cannot Survive Strict Scrutiny. ...................................................... 6

                1.      The law serves no compelling interest. ............................................. 6

                2.      The law is not narrowly tailored. ...................................................... 8

    II.     THE TOUR-GUIDE LICENSING SCHEME IS AN UNCONSTITUTIONAL PRIOR RESTRAINT. .............................................................. 10

          A.      The Law Grants Defendant Unconstitutional Discretion to Discriminate Against Disfavored Speech. ........................................... 10

          B.      The Licensing Scheme Fails to Provide Any Constitutionally-Required Safeguards. .................................................... 12

    III.    THE TOUR-GUIDE LICENSING SCHEME ADVANCES NO LEGITIMATE GOVERNMENT INTEREST. ................................................... 13

**CONCLUSION** ............................................................................................................................ 15

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*832 Corp. v. Gloucester Twp.*, 404 F. Supp. 2d 614 (D.N.J. 2005)..................................13

*Abrams v. United States*, 250 U.S. 616 (1919) ........................................................................7

*Board of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987) .........................8

*Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993)..........................5

*City of Littleton v. Z.J. Gifts D-4, LLC*, 541 U.S. 774 (2004)..........................................13

*Gannett Satellite Information Network, Inc. v. Berger*, 894 F.2d 61 (3d Cir. 1990)......................12

*Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600 (2003) .........................9

*Interna'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672 (1992) .........................4

*Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988) ................................10,11,12

*Lowe v. S.E.C.*, 472 U.S. 181 (1985) ..........................................................................................6

*NAACP v. Button*, 371 U.S. 415 (1963)....................................................................................10

*Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987) ......................................................13

*Nordlinger v. Hahn*, 505 U.S. 1 (1992) ..................................................................................13

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983).......................6

*Pitt News v. Pappert*, 379 F.3d 97 (3d Cir. 2004) ............................................................6

*Riley v. Nat'l Federation of the Blind*, 487 U.S. 781 (1988) .....................................8,9,12

*Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620 (1980).....................................8

*Shuttlesworth v. Birmingham*, 394 U.S. 147 (1969) .........................................................12

*Thomas v. Collins*, 323 U.S. 516 (1945)..........................................................................6,7,8,14

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton*,
536 U.S. 150 (2002)..................................................................................................................5,6,7

**Page(s)**

**Codes**

Phila. Code § 1-109(1) ..................................................................................................................5
       § 9-214(2)(b) ...................................................................................................1
       § 9-214(2)(e) ................................................................................................1,4
       § 9-214(3)(a) ................................................................................................1,4
       § 9-214(3)(b) ...................................................................................................5
       § 9-214(4)(a) ..............................................................................................12,13
       § 9-214(4)(c) ...................................................................................................5
       § 9-214(4)(g) .................................................................................................11
       § 9-214(6) ......................................................................................................11
       § 9-214(10) .....................................................................................................2
       § 9-214(13) .....................................................................................................5

**Other Publications**

Michael Brian Schiffer, *Did Franklin Really Fake the Kite Experiment?*,
History News Network, http://hnn.us/articles/1770.html ...............................................................7

**INTRODUCTION**

This is a straightforward case. The City of Philadelphia has decided that it can improve the quality of historical tours in Center City Philadelphia by prohibiting people from talking about history without first obtaining a government license. The government simply cannot suppress speech in this way in the name of improving speech—the First Amendment does not allow government to act as a gatekeeper to public discussion, particularly public discussion of an issue as important as our nation's history.

Because the Constitution does not allow government to arrogate to itself the power of deciding who is (or is not) qualified to speak on matters of public concern, Plaintiffs respectfully ask this Court to grant preliminary and permanent injunctive relief restraining Defendant Michael Nutter (Defendant)[1] from enforcing the mandatory provisions of Philadelphia Code Section 9-214 (the law). Plaintiffs further request a temporary restraining order preventing enforcement of the law pending this Court's ruling.

**FACTUAL BACKGROUND**

Pursuant to a new Philadelphia ordinance that is scheduled to become effective on October 13, 2008, it will be illegal for anyone to, for compensation, guide or offer to guide one or more persons through Center City while providing information about the city's history or geography without first obtaining a government license. Phila. Code § 9-214(2)(e); 9-214(3)(a). Those who wish to speak on the regulated topics must obtain a license from Defendant, which requires financial burdens (including fees and obtaining special liability insurance) as well as passing a special government test. Phila. Code § 9-214(3). Defendant, however, has discretion

---

[1] Defendant Nutter is sued in his official capacity. The law in question grants Defendant the authority to name or create a "department office, agency or other entity" to administer the law challenged in this lawsuit (see Philadelphia Code section 9-214(2)(b)); the term "Defendant" is meant to encompass Defendant Nutter and any enforcement agency he may designate.

to exempt from the testing requirement guides working for any tour company whose training program he considers "equivalent" to this written test. Phila. Code § 9-214(10).

Plaintiffs are three serious, careful, and enthusiastic students of history who regularly give tours of Center City Philadelphia for compensation.[2] All three care deeply about the Constitution and its history, and each objects to the idea of allowing government officials to determine whether they are qualified to discuss their passion—American history—with their fellow citizens.

Among the three of them, the plaintiffs in this action have led literally hundreds of tours of Philadelphia and possess substantial expertise in the city of Philadelphia's history and geography. Indeed, Plaintiff Ann Boulais is responsible for writing much of the script used by guides from local company American Trolley Tours' on their tours. The tours given by Plaintiffs, moreover, are not limited to traditional historical tours, but include "haunted history" tours focusing on the city's ghost legends and folklore, sports history tours, and African-American history tours.

Just as Plaintiffs have led a wide variety of tours, tour guides in Philadelphia can be hired to give a tour geared to almost any imaginable interest—ranging from tours of sites in Philadelphia that have been featured in Hollywood films to tours focusing on the history of Freemasonry in the city. Additionally, some tour companies provide what some people call "directed tours"—tours in which the guides do not themselves share any information about the city, but simply make sure that an outside tour group gets to different appointments at historically significant locations (directing them from, for example, a tour at Independence Hall to a tour of Christ Church at the appropriate time). Because they do not involve speech on the regulated topics, these "directed tours" would not require a special license under the law.

---

[2] The remaining facts outlined in this section will be established at the October 6 hearing before this Court.

Finally, Plaintiffs' case will demonstrate that the law challenged in this action was motivated solely by concerns about the content of tour guides' speech. Far from being animated by any content-neutral concerns, the legislative history of the law makes clear that the law's proponents were concerned with the quality of what tour guides say—with "the looseness of the presentation," with "the Mayor['s] wanting to retell Philadelphia's story in a more positive way," with a desire "to make sure that [tour-guide information is] standardized." The law's legislative history makes absolutely plain that the new tour-guide licensing requirement was put in place out of concerns over the content of tour guides' speech.

## ARGUMENT

Plaintiffs' argument is simple: under the First Amendment, people in the United States are allowed to talk about history—and they do not need the government's permission to do so. The law challenged here cannot be squared with either the First Amendment or Supreme Court precedent. It is not content-neutral. It does not advance a compelling government interest. It is not narrowly tailored. Even if one were to assume the law were content-neutral (which it clearly is not), it grants Defendant unfettered discretion to discriminate against disliked speakers and fails to provide a concrete timeframe for the issuance of licenses. In short, the law fails to achieve *any* of the basic requirements for a constitutionally sound licensing regime, and Plaintiffs respectfully request that Defendant be enjoined from enforcing the law's mandatory provisions.

It is worth noting at the outset that the relief sought by Plaintiffs in this action is narrow. The law creates a mandatory tour-guide licensing scheme, requiring anyone who wishes to speak about history or geography for compensation while leading people through the public streets of Center City Philadelphia to obtain the government's permission and (among other requirements)

pass a test.  Plaintiffs do not seek to enjoin Defendant from offering any sort of tour-guide certification program—Defendant is free to offer a voluntary certification program or even official government-sponsored tour guides.  Rather, Plaintiffs object to the mandatory nature of the law—they object to the fact that it will be illegal to speak without the government's permission and that the government will have the authority to silence speakers who it deems unfit.

Any number of constitutionally sound options are available to Defendant if he sincerely wishes to try to improve the quality of tours in Philadelphia, but those options do not—cannot— include the authority to punish people for unauthorized talking.

## I. PHILADELPHIA'S TOUR-GUIDE LICENSING SCHEME IS AN UNCONSTITUTIONAL CONTENT-BASED RESTRICTION ON SPEECH.

Philadelphia's law singles out speech with particular content for unique burdens.  It imposes those burdens out of a desire to protect the public from speech with purportedly undesirable content.  Nothing could be more antithetical to the First Amendment.

### A. The Licensing Law Is Content-Based.

The law is unquestionably content-based.  In order to fall within the law's requirements, a person must meet two criteria.  First, he or she must (for compensation) guide one or more persons within Center City Philadelphia (or offer to do the same).  Second, he or she must "provide[] information on the City's geography, history, historic sites, historic structures, historic objects, or other places of interest."  Philadelphia Code § 9-214(2)(e); 9-214(3)(a).  The law applies only to speech on public streets or other public rights-of-way.[3]

---

[3] Public streets are, of course, "quintessential public forums."  *Internat'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 696 (1992) (Kennedy, J., concurring in the judgments) (citing cases).

4

In other words, the law burdens only people who engage in certain speech. People who conduct groups of people through town without sharing their views on the prohibited topics may do so freely—for example, one may drive a bus for compensation through Center City without bearing any of the burdens imposed by the law, but one may *not* drive that same bus for compensation while telling passengers stories about various sites as they pass by. Similarly, a person can lead a "directed tour" (described above), shuttling tour groups to and from different appointments without being forced to bear any special burden—but the law's burdens kick in as soon as that person starts sharing her knowledge or opinions about the city's geography, history or places of interest. The directed-tour leader or bus driver may entertain a group by singing songs or recounting the plots of novels; they simply may not stray onto forbidden topics without risking hundreds of dollars in fines and the loss of their business license. *See* Phila. Code §§ 1-109(1); 9-214(13) (outlining penalties for violations).[4]

The burdens imposed by the law are significant. People who want to talk about history must submit a written application; take and pass a written examination (the content and length of which is entirely within Defendant's discretion); pay a non-refundable application fee;[5] and provide proof of liability insurance in whatever amount the Office of Risk Management deems necessary. Phila. Code § 9-214(3)(b). Moreover, it makes speech impossible without first passing the city's test—requiring would-be guides to wait (at minimum) one month before they may begin speaking. *Cf. Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of*

---

[4] The law also fails to require anything of individuals who talk about history but do not lead people anywhere—leaving library personnel, historical re-enactors, and other members of the tourism industry (all of whom are just as likely to provide customers with inaccurate information as are tour guides) unregulated and giving the lie to any claim of a compelling interest. *See, e.g., Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 547 (1993) ("It is established in our strict scrutiny jurisprudence that a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.") (internal quotation marks and citations omitted).

[5] It is unclear what, if any, actual costs this fee is meant to defray, as "the reasonable costs associated with . . . the written examination" are covered by a separate fee assessed against would-be guides. Phila. Code § 9-214(4)(c).

*Stratton*, 536 U.S. 150, 167-68 (2002) (striking down licensing requirement because it would "effectively ban[ ]" spontaneous door-to-door advocacy "on a holiday or a weekend" by requiring speakers to obtain a permit in advance).

Courts have used various formulations to determine when a law is "content-based," but there can be no question that, as succinctly stated by then-Judge Alito, "[i]mposing a financial burden on a speaker based on the content of the speaker's expression is a content-based restriction of expression and must be analyzed as such." *Pitt News v. Pappert*, 379 F.3d 97, 106 (3d Cir. 2004). Content-based restrictions on speech must survive strict scrutiny and must therefore be narrowly tailored to serve a compelling state interest. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). This is a standard Philadelphia's tour-guide licensing law cannot hope to meet.

### B. The Law Cannot Survive Strict Scrutiny.

Philadelphia's law is not narrowly tailored to serve any compelling interest—and, indeed, any argument to the contrary strikes at the heart of the very purpose of the First Amendment.

#### 1. The law serves no compelling interest.

The city of Philadelphia has no compelling interest in establishing minimum qualifications to talk about history.

In essence, the law aims to improve the quality of speech by the city's tour guides by forbidding those who do not pass a test from speaking about history for compensation.[6] But the government has no compelling interest in limiting participation in the marketplace of ideas to those who it deems qualified. "The very purpose of the First Amendment is to foreclose public

---

[6] The law makes plain that the test is meant to gauge the applicant's knowledge of geography, history, etc. Phila. Code § 9-214 (4)(b). *Cf. Lowe v. S.E.C.*, 472 U.S. 181, 229-30 (1985) (White, J., concurring) ("[T]he principle that government may restrict entry into professions and vocations through licensing schemes has never been extended to encompass the licensing of speech *per se* or of the press.")

6

authority from assuming a guardianship of the public mind through regulating the press, speech, and religion.  In this field every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us."  *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring).

These principles particularly hold true in the context of history—a subject of constant debate, controversy, and revision.  Even the truth of stories known by schoolchildren nationwide, such as Benjamin Franklin's famous experiment involving a kite, a key, and a lightning storm, is still hotly contested.  *See, e.g.,* Michael Brian Schiffer, *Did Franklin Really Fake the Kite Experiment?*, History News Network, available at http://hnn.us/articles/1770.html (discussing the controversy).  Allowing the government to condition the right to speak about history on the ability to pass a history test necessarily gives it the power to resolve any disputes about what that history *is*.  This power cannot be squared with the central idea of American free speech jurisprudence, that "the best test of truth is the power of [a] thought to get itself accepted in the competition of the market."  *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).

The idea that government may pass judgment on speakers' qualifications before allowing them to address their fellow citizens in a public forum is anathema to the First Amendment and at odds with Supreme Court precedent.  In the Supreme Court's extensive precedents discussing permissible regulation of First Amendment activity, there is no suggestion that the state may require a permit to speak in order to improve (by its own estimation) the *quality* of the speech. *See Watchtower Bible & Tract Soc't of New York, Inc. v. Village of Stratton*, 536 U.S. at 164-69 (striking down law forbidding any door-to-door advocacy without first obtaining a permit); *Thomas v. Collins*, 323 U.S. 516, 539-40 (1945) (invalidating permit requirement for union-

recruitment speech); *see also Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 628-632 (1980) (summarizing cases). To allow such a justification of a licensing requirement would essentially gut the First Amendment—it is black-letter law that "a speaker is no less a speaker because he or she is paid to speak." *Riley v. Nat'l Federation of the Blind*, 487 U.S. 781, 801 (1988). Allowing Philadelphia to "improve" the quality of tour guides' speech through licensing would allow that same justification to support the mandatory licensing of radio hosts, political signature-gatherers, and, truly, speakers of every stripe.

### 2.     The law is not narrowly tailored.

Even if one were to assume some compelling interest in improving the quality of tour guides' speech, the law is substantially overbroad. By its own terms, the law regulates the speech of anyone who speaks for compensation about "geography" or "history." But, as discussed above, tour guides in Philadelphia speak on an extensive range of subjects. For example, someone who gives a tour of places in Philadelphia that have been featured in motion pictures surely provides information about the city's "geography," but it is equally sure that a test requiring knowledge of "history, historic sites, historic structures [or] historic objects" would be irrelevant to anything said on that tour.[7] By requiring a single test of *everyone* who wishes to speak about broad topics like history or geography, the law lacks any "nexus" between a particular guide's speech and the particular knowledge required to pass the test. *Id*. at 793. The law, therefore, "does not merely regulate expressive activity . . . that might create problems" that the law would supposedly ameliorate—it regulates *all* speech about history or geography on the grounds that *some* of this speech might create problems that its testing requirement might address. *Board of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987).

---

[7] Of course, if the city's test *did* require knowledge of locations appearing in various Hollywood films, that would bear no relationship to the qualifications of someone who wanted to give a traditional historical tour.

8

Nor is the law narrowly tailored to advance any other compelling interest. To the extent the law seeks to serve as a consumer-protection measure, its reach is simply far too broad. If the city wishes to protect consumers who cannot discern a tour guide's level of knowledge before going on his tour, it could address that concern with a voluntary licensing program. Tour guides who passed the city's voluntary test could refer to themselves as "city-certified tour guides," and consumers could be secure in the knowledge that they were listening to someone who had the government's imprimatur. It is true that, given a voluntary program, some consumers might choose to continue going on unlicensed tours, but that would simply mean that the marketplace of ideas did not value the government's certification. Just as "the First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it," audiences, and not the government, will know best what they want to hear and from whom they want to hear it. *See Riley v. Nat'l Federation of the Blind*, 487 U.S. at 790-91 (1988).

Voluntary certification is not the only narrower option available to advance consumer protection. If the city were genuinely worried about, for example, some form of consumer fraud, it could protect consumers by devising "a properly tailored fraud action targeting fraudulent representations themselves . . . ." *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 619 (2003). It could also provide government-sponsored education for guides, ensuring that sufficient resources for tour-guide training are available. It could even hire its own tour guides, ensuring that an "official" version of history is available for interested tourists. Any of these approaches could address the city's legitimate concerns without imposing a broad prophylactic measure that infringes on the fundamental rights of every tour guide in Philadelphia.

Based solely on the fact that some tour guides sometimes say things that are false, the city of Philadelphia has arrogated to itself the power to decide who is and is not qualified to speak to their fellow citizens about their shared history or geography. Such a broad regulation of free speech cannot stand, particularly in view of the much narrower avenues available to address any legitimate concerns the government may have. *Cf. NAACP v. Button*, 371 U.S. 415, 438 (1963) ("Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone. . . ." ) (citations omitted).

## II.  THE TOUR-GUIDE LICENSING SCHEME IS AN UNCONSTITUTIONAL PRIOR RESTRAINT.

Even assuming *arguendo* that Philadelphia's tour-guide licensing scheme can somehow be viewed as a content-neutral restriction (which it obviously is not), the licensing procedures create an unconstitutional prior restraint.

### A.  The Law Grants Defendant Unconstitutional Discretion to Discriminate Against Disfavored Speech.

Even a content-neutral licensing scheme may be challenged on its face if (1) it gives a government official "substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers" and (2) if the law has "a close enough nexus to expression . . . to pose a real and substantial threat of the identified censorship risks." *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988). We need not discuss the second criterion. As explained above, the law regulates pure speech—where the conduct at issue in *Lakewood* (placing newsracks) was merely *intertwined* with speech, Plaintiffs' conduct here is just speech. *Id.* at 768.

The law also grants Defendant substantial discretion to discriminate among speakers. While the law imposes burdens on all speakers in the form of an (unspecified) insurance

10

requirement and continuing-education requirements, it imposes the additional burden of a testing requirement only upon those individuals whom Defendant decides should bear that burden. Defendant has absolute discretion to exempt the employees of any company from the testing requirement.  As long as Defendant determines that a company's own education and evaluation programs are "equivalent" to the written examination, Defendant has absolutely boundless discretion to exempt guides working with that company from the law's testing requirement. Phila. Code § 9-214(4)(g).  In other words, the government may require—or not require—individuals to take a test before they speak, and that decision is vested entirely in Defendant's discretion.

This discretion is particularly important here because, like the regulation at issue in *Lakewood*, the law at issue here creates "the sort of system in which an individual must apply for multiple licenses over time, or periodically renew a license."  *Lakewood*, 486 U.S. at 759; *see also* Phila. Code § 9-214(6) (recertification procedures).  "A speaker in this position is under no illusion regarding the effect of the 'licensed' speech on the ability to continue speaking in the future.  Yet demonstrating the link between 'licensed' expression and the denial of a later license might well prove impossible."  *Lakewood*, 486 U.S. at 759-760.

The level of burden imposed by the testing requirement is also wholly within Defendant's discretion.  Except for the vague topical constraints (such as "history" and "geography"), the statute does not impose any requirements concerning the length, difficulty, form or minimum passing score of the test, nor does it impose any constraint on how often the test may be updated. In combination with the uncabined discretion to exempt favored speakers (that is, to make sure that only disliked speakers have to take the test), this provides Defendant with unfettered power

to choose who may and may not speak—not just prospectively, but every two years when licenses come up for renewal.

Where a government official is given discretion to grant or deny the right to speak, the law or regulation in question must "set forth [ ] standards by which [the official] is to exercise [his] discretion." *Gannett Satellite Information Network, Inc. v. Berger*, 894 F.2d 61, 69 (3d Cir. 1990). The law's requirements that the examination "test the applicant's knowledge" of certain broad topics or that Defendant "consult[ ] with any group or agency [it] deems appropriate" amount to no check on Defendant's discretion at all. Phila. Code § 9-214(4)(a). Allowing such "illusory 'constraints' to constitute the standards necessary to bound a licensor's discretion renders the guarantee against censorship little more than a high-sounding ideal." *Lakewood*, 486 U.S. at 769-770 (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150 (1969).

### B. The Licensing Scheme Fails to Provide Any Constitutionally Required Safeguards.

Even if the law were content neutral (which it is not) and even were it narrowly tailored (which it is not), it would still fail constitutional scrutiny. Even where courts uphold licensing regimes as permissible content-neutral regulations, they have demanded certain safeguards. Permissible licensing schemes must restrict the licensing official's discretion by providing objective criteria for granting or denying a license (which, as explained above, Philadelphia's law fails to do). They must also, however, require the license to be issued within a set period of time, because "delay compel[s] the speaker's silence." *Riley*, 487 U.S. at 802. Philadelphia's law fails on this score as well.

Far from requiring that licenses be granted expeditiously, Philadelphia's law imposes potentially enormous delays. Once someone in Philadelphia decides she wants to give tours for compensation, she must wait until the next time a test is offered—which could be as much as a

12

month away.  *See* Phila. Code § 9-214(4)(a).  She then must wait while the test is graded—and the law imposes no obligation on anyone to grade the test in a particular amount of time.  Then, after waiting however many weeks or months Defendant deems appropriate, the would-be guide either receives a passing grade (and is allowed, at last, to speak) or fails to receive a passing grade—in which case the whole process begins again.  In other words, from the moment a person decides he or she wishes to give tours for compensation, the delay until a permit is granted will be some amount of time between one month and forever.  Constitutionally valid licensing schemes must provide for a concrete deadline for a *final* licensing decision (that is, one subject to judicial review).  *See, e.g.*, *City of Littleton v. Z.J. Gifts D-4, LLC*, 541 U.S. 774, 777 (2004) (40 days); *832 Corp. v. Gloucester Twp.*, 404 F. Supp. 2d 614, 629 (D.N.J. 2005) (90 days).  The undefined waiting-period imposed by Philadelphia's test simply fails to provide the kind of certainty required by controlling precedent.

### III. THE TOUR-GUIDE LICENSING SCHEME ADVANCES NO LEGITIMATE GOVERNMENTAL INTEREST.

The tour-guide licensing scheme is also unconstitutional under the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  To pass muster under these clauses, a law must "rationally further[ ] a legitimate state interest."  *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992).

A "legitimate state interest," however, does not simply mean "anything a government entity wants to do."  *Cf. Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 837 (1987) ("Whatever may be the outer limits of 'legitimate state interests' in the takings and land-use context, [obtaining an easement without compensation] is [beyond] them.")  The only interest served by the mandatory provisions of this law is the interest in ensuring that people can only listen to

13

government-approved speakers—a interest that is plainly beyond the legitimate scope of government.

This point is best illustrated by considering what would happen if Plaintiffs' narrow injunction request were granted. Because Plaintiffs seek to enjoin only the mandatory provisions of the law (that is, the provisions that allow the city to punish tour guides who refuse certification), it would leave in place a voluntary tour-guide certification program, in which approved guides could advertise to consumers that they had passed the city's test or were "city-certified tour guides."

The only difference between this voluntary program and the law the city passed is that the voluntary program does not silence speakers the city deems unqualified. If the licensing program were voluntary, consumers might choose to ignore the "city-certified tour guides" and continue to take tours with unlicensed guides. But the city has no legitimate interest in taking that option away from the public. Speakers (and audiences) may persist in saying (and listening to) things the city wishes were not said, but the city has no business imposing its vision of a "good tour" on guides and citizens who disagree with it. "[I]t cannot be the duty, because it is not the right, of the state to protect against false doctrine." *Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring).

The only end achieved by a mandatory tour-guide licensing scheme (as distinct from a voluntary licensing scheme) is the silencing of tour guides who do not meet the government's standards. Because this end is patently illegitimate, the mandatory portions of the law must be enjoined under the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

**CONCLUSION**

Philadelphia's tour-guide licensing scheme is a content-based restriction on speech at the very core of the First Amendment. Permitting the city to "improve" the quality of the city's tours by silencing speakers it deems unfit can no more be squared with the First Amendment than could an attempt by a government to improve the quality of its ballot initiatives by silencing petitioners it deemed underqualified. This law infringes Plaintiffs' fundamental right to discuss with their fellow citizens the history and culture of the city they love, and Defendant must be permanently enjoined from enforcing the law's mandatory provisions.

Dated this 15th day of September, 2008.

Respectfully submitted,

/s/ Robert J. McNamara
INSTITUTE FOR JUSTICE
William H. Mellor (DC Bar No. 462072)*
Robert J. McNamara (VA Bar No. 73208)*
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
Tel:  (703) 682-9320
Fax:  (703) 682-9321
Email:  wmellor@ij.org; rmcnamara@ij.org
*Admitted *Pro Hac Vice*
*Counsel for Plaintiffs*

LEVINE SULLIVAN KOCH
  & SCHULZ, L.L.P.
Gayle C. Sproul (I.D. No. 38833)
Michael Berry (I.D. No. 86351)
2112 Walnut Street, Third Floor
Philadelphia, PA 19103
Tel: (215) 988-9778
Fax: (215) 988-9750
Email: gsproul@lskslaw.com,
mberry@lskslaw.com
*Local Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on September 15, 2008, a true and correct copy of Plaintiffs' Memorandum of Law In Support of Motion for Preliminary and Permanent Injunctive Relief was electronically filed using the Court's ECF system and is available for viewing and downloading from the Court's ECF system to the following counsel of record:

Nicole S. Morris
Assistant City Solicitor
Law Department-Civil Rights Unit
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
Attorney for Defendant City of Philadelphia


                                        /s/ Robert J. McNamara
                                        INSTITUTE FOR JUSTICE