**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL TAIT, ET AL.,** | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| **v.** | : | |
| | : | **No. 08-3083** |
| **CITY OF PHILADELPHIA,** | : | |
| **Defendant.** | : | |

**SUPPLEMENTAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
ON BEHALF OF DEFENDANT THE CITY OF PHILADELPHIA**

**I.      PROPOSED FINDINGS OF FACT**

**A.      Philadelphia Code § 9-214 ("The Tour Guide Ordinance")**

**1.      Legislative History.**

**a.      May 10, 2007 Hearing.**

1.      On May 10, 2007, the Committee on Parks, Recreation, and Cultural Affairs held a hearing on Bill 070229, a proposed section of the Philadelphia Code that would create tour guide certification in the City of Philadelphia.

2.      During that hearing, the Committee heard conflicting testimony from tour guides and tour company operators about the proposed Bill.  Some persons wanted a mandatory certification program, others a voluntary certification program.  May 10 Tr. at 8, 29, 34, 77-80.

3.      Other persons who testified cited to the importance of training for tour guides, whether as part of an already-existing programs or as part of any City ordinance regulating tour guides.  May 10 Tr. at 46-47, 48-49, 55-56.

4.      One of the persons who testified was Ron Avery, a retired newspaper reporter and long-time tour guide in the City of Philadelphia.

5.      In addition to having led over 100 tours in the City, Ron Avery had been a customer and observer on many tours in the City and elsewhere.

6.      Ron Avery was concerned about the incompetence and lack of training he observed in the tour guide industry in the City, and he wrote letters to City Council members about his concerns.

7.      In his testimony, Ron Avery listed factual mistakes he had heard during tours and criticized the lack of training for paid tour guides in the City – as opposed to the two years of training that volunteer guides at the Art Museum receive.  May 10 Tr. at 6-9.

8.      Ron Avery also emphasized that paid tour guides in the City should have some basic mastery of local historical facts and be licensed by the City for that purpose.  May 10 Tr. at 6-9.

9.      At the end of the hearing, Councilwoman Blondell Reynolds-Brown said that it was time to "push the pause button" and gather more information before moving forward with the Bill.  May 10 Tr. at 90.[1]

10.      Councilwoman Reynolds-Brown announced that her office would put together a task force to meet over the course of the next three months, and that any person who wanted to be on the task force could contact her office and join the group.  May 10 Tr. at 90.

11.      Councilwoman Reynolds-Brown explained that the task force would meet over the next ninety days, "factor in the various perspectives" presented, and then make recommendations about whether and how to go forward with the Bill.  May 10 Tr. at 90-92.

12.      The Councilwoman also asked people to submit information about what other historic cities had done in the area of tour guide certification.  May 10 Tr. at 92.

13.      Federal Military Parks have instituted licensing and exam requirements for tour guides.  *See* 36 C.F.R. § 25.1 *et seq.*

14.      New York City, Savannah, Charleston, New Orleans, Washington, D.C., and Williamsburg, Virginia have also instituted licensing and exam requirements for tour guides who wish to lead paid tours within their city limits.  *See* NYC Administrative Code § 20-242; 6

---

[1]Plaintiffs have indicated that they may have a hearsay objection to the City's citations to the Committee hearing transcripts.  If such an objection is lodged, the City's response is:  1) The Committee hearings are legislative history, and no more hearsay than USCCAN or the Congressional Record; and 2) in any event, the hearings are admissible public records under Fed. R. Evid. 803(8)(A) & (B).

Savannah Code § 6-1502; 29 Charleston Code § 29-58; 30 New Orleans Code, Ch. XXI, § 30-1486; 12 DCMR §§ 1201.1; Williamsburg Code § 9-331.

15.     The licensing requirements in other cities include examinations (both written and oral) as well as requirements for insurance; physician certifications; fingerprints; criminal background checks; character references; and employment history; and exemptions for volunteers and teachers from testing programs.  *See* Va. Code Ann. § 15.2-946 (2008); Williamsburg Code § 9-333; Williamsburg Code §§ 9-333, 9-338; 12 DCMR §§ 1201.1, 1201.2, 1201.4, 1201.6, 1202.9, 1202.12, 1202.16, 1202.17; 29 Charleston Code § 29-58; 30 New Orleans Code, Ch. XXI, § 30-1553; 6 Savannah Code §§ 6-1510, 6-1511, 6-1513, 6-1514, Article T; NYC Administrative Code § 20-244(b).

### b.     February 20, 2008 Hearing.

16.     On February 20, 2008, the Committee on Parks, Recreation, and Cultural Affairs held a hearing on Bill 80024, which set forth a revised version of a tour guide certification program.

17.     Councilwoman Blondell-Reynolds-Brown began the hearing by describing meetings her office had with tour guides; a survey her office sent to persons in the tourism industry regarding the Bill; and the task force that had worked on questions raised about the Bill. Feb. 20 Tr. at 1-5.

18.     The Councilwoman also informed the persons present that the Bill would have two phases of implementation.  Feb. 20 Tr. at 6.

19.     The first phase would be to certify tour guides in the Center City area.  Feb. 20 Tr. at 7.

20.     City Council would then receive a status report within two years of the effective date of the ordinance that would offer recommendations for the program, including whether the program should be expanded to include the entire City.  If so, there would be a new legislative process regarding City-wide tour guide certification.  Feb. 20 Tr. at 7.

21.     The Committee heard further testimony about the Bill.

22.     Melanie Johnson, the City Representative, testified.

23.     As the City Representative, Melanie Johnson's duties include the promotion and marketing of the City of Philadelphia.

24.     In Melanie Johnson's testimony, she emphasized that Philadelphia's history was one of the City's greatest assets, and that a tour guide certification program would help to preserve that history.  Feb. 20 Tr. at 11.

25.     Melanie Johnson also testified that the tour guide certification program would help the City's tourism industry and its economy.  Feb. 20 Tr. at 11.

26.     Other persons who testified emphasized that preserving the City's history, in all of its forms, was important to the City's identity as well as the local economy.  Feb. 20 Tr. at 22, 47-48, 53, 81-82 (importance of history in Philadelphia), 29 (5 million visitors per year to Independence National Park), 47 (2005: $ 6 billion spent by tourists in the City).

27.     Other persons who testified emphasized that the primary draw for tourists was the downtown area of the City and the area around Independence Hall and the Liberty Bell.  Feb. 20 Tr. at 29 (5 million visitors per year to Independence National Park); 47-51.

28.     Ron Avery also testified.

29.     Ron Avery explained that the Bill was not about "standardization" of tour guide presentations, because tour guides were going to say "what they want" regardless of what was set forth in the Bill, and that instead tour guides would have to "pass a test on basic facts." Feb. 20 Tr. at 37-39.

30.     The Tour Guide Ordinance does not have an effect on the content of what tour guides say.

31.     Councilwoman Reynolds-Brown also explained that the Bill would result in a "standard baseline of information that every tour operator should be familiar with." 83-84

32.     Some of the testimony at the hearing referred to certification programs in other cities, and how certification "sets a standard and raises the bar for performance. . . . [i]n some

4

cities it seems to have elevated the status of the profession." Feb. 10 Tr. at 53, 11 & 15 (citing certification programs in New York, Washington, D.C., New Orleans, Savannah, Charleston, and New Orleans).

33.     The Committee voted to send the Bill to the full City Council for consideration. Feb. 20 Tr. at 96.

34.     On April 3, 2008, Philadelphia City Council passed Bill 080024-A.

35.     Mayor Michael Nutter signed Bill 080024-A, now Philadelphia Code § 9-214, on April 16, 2008.

**2.     The Tour Guide Ordinance.**

36.     The Tour Guide Ordinance applies to persons who wish to lead tours for compensation in the Center City Tourist Area, which is the "area of the City extending from the Delaware River to the Schuylkill River from Vine Street to South Street."  Section 9-214(2).

37.     The purpose of the Tour Guide Ordinance is to ensure that tour guides conducting tours for compensation in the Center City Tourist Area have "adequate knowledge of the geography, history, historic sites, historic structures, historic objects and other places of interest within that area," by requiring that such tour guides become certified.  Section 9-214(1).

38.     The Tour Guide Ordinance defines a "tour guide" as:

> Any person, whether self-employed or an employee of a tour service company, who for compensation, offers to guide and direct or guides and directs one or more persons within the City and provides information on the City's geography, history, historic sites, historic structures, historic objects or other places of interest.

Section 9-214(2)(e).

39.     A Tour Guide Company is any "sole proprietorship, firm, association, partnership, limited liability company, or corporation that operates tours in the City for compensation." Section 9-214(2)(f).

40.     A person wishing to be certified as a Tour Guide in the Center City Tourist Area must:  1) submit an application; 2) be at least 16 years of age; 3) take and pass a written examination or provide proof of exemption; 4) pay a $25 fee; and 5) provide proof of insurance in an amount determined by the Office of Risk Management.  Section 9-214(3).

41.     The written examination shall be administered "at least once a month" on a schedule published in a newspaper of general circulation or the City's website.  Section 9-214(4).

42.     The exam shall be designed to test "the applicant's knowledge of the geography, history, historic sites, historic structures, historic objects and other places of interest in the Center City Tourist Area."  Section 9-214(4)(a).

43.     In order to prepare the examination, the City may consult with outside groups, and in determining the groups to be consulted, the department must consider the racial, gender, ethnic, and cultural diversity of the City.  Section 9-214(4)(a).

44.     An applicant receives a syllabus or list of source materials, or both, from which the examination questions shall be taken.  Section 9-214(4)(b).

45.     The City determines the grade necessary to pass the written examination.  Section 9-214(4)(d)

46.     If an applicant does not pass the exam, the applicant can retake the next exam without filing another application.  Section 9-214(4)(f).

47.     A certificate is valid for two years, and a tour guide may recertified by either completing four hours of continuing education provided by the City or by completing a program provided by a tour service company that has been approved for continuing education by the City.  Section 9-214(g).

48.     The City will issue badges to certified tour guides and maintain a current list of all certified tour guides on the City's website.  Section 9-214(8) & (9).

49.     Section 9-214 also provides for exemptions from its provisions.   Persons who are "volunteers, teachers providing information while sightseeing with their students, or persons

offering or conducting tours on private property" are exempt from the Tour Guide Ordinance. Section 9-214(10).

50.     Any tour service company that has an educational program through which it instructs and evaluates its tour guides may request an exemption from the written examination. Section 9-214(4).

51.     If the City determines that the educational program and mode of evaluation is equivalent to or exceeds the written exam, the employees of such a company will be exempted from the written exam.  Section 9-214(4).  The exemption is renewable every two years.  Section 9-214(4).

52.     The Tour Guide Ordinance authorizes the City to promulgate regulations to implement the Ordinance.  Section 9-214(11).

53.     The Tour Guide Ordinance also provides for notice of enforcement, enforcement and penalties in accordance with other provisions of the Code.  Section 9-214(12) (enforcement, *citing* § 1-112) & 13 (penalties, *citing* § 1-109).

54.     A person wishing to contest a decision made under the Tour Guide Ordinance has a right of appeal to the Board of License & Inspection Review and the Court of Common Pleas. Section 9-103 (enforcement and appeals); 2 Pa. C.S.A. § 752 (local agency appeals).

55.     The Tour Guide Ordinance also provides that within two years of its implementation, the City will make a report to City Council regarding the effectiveness of the Ordinance and any recommendations it may have regarding the program, including expanding the program to include the entire City.  Section 9-214(14).

**3.     Administration of the Tour Guide Ordinance and Importance of the Ordinance.**

56.     The Office of the City Representative is the City office that has been assigned the administration the Tour Guide certification program.

57.     The City is in the midst of a budget crisis.

58.     The Office of the City Representative has not yet drafted the exam or the final terms of the exemption.

59.     The Office of the City Representative does not yet have the staff or resources to implement the exam or enforce the ordinance.

60.     The City Representative is planning to reach out to entities and groups in the City to aid with the drafting of the exam on a volunteer basis.

61.     The City is known as a historically significant City, and the City is interested in preserving and celebrating that history.

62.     The tourism industry offers the City income and visibility.

63.     Insurance requirements for tour guides address consumer protection and liability concerns.

64.     The Ordinance imposes a minimum competency requirement on tour guides who wish to lead paid tours in the Center City Tourist Area.

**B.      Plaintiffs Michael Tait, Ann Boulais, and Joshua Silver.**

65.     Plaintiff Michael Tait is a resident of Philadelphia, Pennsylvania.  He currently earns a living as a tour guide, leading tours through Center City Philadelphia as an employee of Constitutional Guided Walking Tours, LLC, a Philadelphia-based tour company, and as an independent contractor working for various tour companies operating in the city.

66.     Plaintiff Ann Boulais is a resident of Philadelphia, Pennsylvania.  She is an employee of American Trolley Tours, in which capacity she both writes scripts used by the company's tour guides and leads tours through Center City Philadelphia herself.

67.     Plaintiff Joshua Silver is a resident of Philadelphia, Pennsylvania.  He currently earns a living as tour guide, leading tours through Center City Philadelphia as an independent contractor for various tour companies operating in the city.

68.     None of the three Plaintiffs want to have to obtain a license from the City in order to continue leading tours for compensation through the Center City Tourist Area.

69.     Plaintiffs have given and continue to give a variety of types of tours of the City of Philadelphia.  All have given general historical tours of the Center City Tourist Area.

70.     Plaintiffs' tours consist of providing information about the City of Philadelphia to a group of one or more persons.

71.     Plaintiffs also have given and continue to give other types of tours, such as "haunted history" tours focusing on the city's ghost legends and folklore, sports history tours, and African-American history tours.

72.     Among the three of them, Plaintiffs have led literally hundreds of tours and possess substantial expertise in the City of Philadelphia's geography and history.

73.     Provided that plaintiffs' tours travel through the Center City Tourist Area, section 9-214 would require them to be led by a city-certified tour guide, regardless of their topic.  The requirements to obtain a tour guide certificate would not vary based on the topic of the tour.

**C.     Procedural History and Course of Litigation.**

74.     Plaintiffs filed their complaint on July 2, 2008, and their motion for a preliminary and permanent injunction on September 15, 2008.

75.     In their complaint, plaintiffs alleged a facial and as-applied First Amendment challenge to the Tour Guide Ordinance.  Plaintiffs also alleged Fourteenth Amendment substantive due process and equal protection claims.

76.     The injunction hearing was continued, and the Ordinance stayed by mutual agreement of the parties, in accordance with this Court's October 9, 2008, order that the parties attempt to settle this matter.

77.     Pursuant to this Court's Order, the City agreed to stipulate to the following in an effort to resolve the litigation:

a) An applicant shall be notified of the results of an examination within 14 days of the date the applicant took the exam;

b) A self-employed Tour Guide may submit an application for an exemption under § 9-214(g) on the basis that the Tour Guide's qualifications or training are equivalent to or exceed the written examination given under this Section;

c) The written examination will consist of 150 multiple choice questions, to be given in one test session of two hours in length. A score of 97 correct answers will be required to pass the examination; and

d) Motor Vehicles and Common or Contract Carriers will follow insurance requirements as set forth in Title 66 and Title 75 of the PA Code and applicable Commonwealth regulations. Carriage Horse Tours will follow the insurance requirements set forth in § 9-402(3)(a) and applicable City regulations. For all other forms of tours, the City will stipulate that the requirement is $1,000,000.00 in liability insurance, as this is the base line requirement for all City contracts. Risk Management will continue to research whether, for the final promulgation of regulations, there will be subsets of requirements for groups and/or individual contractors who lead walking tours or other types of tours in the City.

78.     The parties were unable to settle the matter.

79.     This Court scheduled a permanent injunction/bench trial for April 24, 2009.


## II.     CONCLUSIONS OF LAW

### A.     Applicable Standard.

1.      In deciding whether to grant a permanent injunction, this Court must consider whether: 1) plaintiffs will be irreparably harmed by the denial of injunctive relief; 2) plaintiffs have shown actual success on the merits of their claims; 3) the granting of the permanent injunction will result in even greater harm to the defendant; and 4) the injunction would be in the public interest. *See Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001), *citing ACLU v. Black Horse Pike Reg'l Bd. of Educ.*, 843 F.3d 1471, 1477 nn. 2-3 (3d Cir. 1996).

### B.     Plaintiffs Cannot Demonstrate Irreparable Harm.

2.      Plaintiffs must demonstrate "a presently existing actual threat" to meet the irreparable harm requirement for a permanent injunction. *See Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000). Plaintiffs have not done so.

3.     Due to a budget crisis at the City, the exam has not yet been drafted, nor is there an administrative structure in place at this time to administer the certification exam and to enforce the ordinance.

4.     Even when, at some point in the future, the exam is drafted and in place, plaintiffs may never take the exam, because they may be exempted from doing so due to the existence of training programs offered by their employers; their own expertise; or their educational background.

5.     Plaintiffs cannot claim irreparable harm from a certification requirement that may never apply to them, or that might apply to them at some unknown point in the future. *See, e.g.*, *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 849-50 (7th Cir. 2003) (City licensing requirement that seller of used goods be of "good character and repute," music store owner failed to demonstrate irreparable harm for any First Amendment challenge where he had not applied for a license).

6.     Also, plaintiffs cannot claim irreparable harm simply because they will have to spend $25.00 on a license application at some point in the future, or because they claim a potential financial impact from the exam itself. *See, e.g.*, *Hohe v. Casey*, 868 F.2d 69 (3d Cir. 1989) (no irreparable harm where the First Amendment "deprivation" is purely monetary). Therefore, plaintiffs' as-applied claims fail.

7.     Plaintiffs' failure to demonstrate irreparable harm also undoes their facial challenges to the Tour Guide Ordinance. *See Washington State Grange v. Washington State Republican Party*, 128 S. Ct. 1184, 1193 (2008) (saying that something is "possible" or may possibly happen is not sufficient to sustain a facial challenge, including when a plaintiff alleges that fundamental constitutional rights are implicated); *Crawford v. Marion County Election Board*, 128 S. Ct. 1610, 1622 (2008) (same).

**C.    Plaintiffs Have Not Succeeded on the Merits of Their Claims.**

**1.    Plaintiffs' First Amendment Claims Fail.**

**a.  The Tour Guide Ordinance is an Economic Regulation Subject to Rational Basis Review.**

8.    Plaintiffs claim that the Tour Guide Ordinance is a speech regulation and is therefore subject to strict scrutiny.  This Court should reject plaintiffs' contention, because the Tour Guide Ordinance is an economic regulation of a profession or vocation, and therefore subject to rational basis review.  *Thomas v. Collins*, 323 U.S. 516, 544 (1945) (Jackson, J.) (noting the government's "well-settled right reasonably to regulate the pursuit of a vocation"); *Lowe v. SEC*, 472 U.S. 181, 227 (White, J.) (government "may restrict entry into professions and vocations through licensing schemes" but cannot license speech *per se* or the press).

9.    First Amendment protections do not necessarily attach "merely because the conduct being regulated was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'"  *United States v. Bell*, 414 F.3d 474, 478 (3d Cir. 2005), *quoting Giboney v. Empire Storage Co.*, 336 U.S. 490, 502 (1949) (Black, J.); *see also SEC v. Suter*, 732 F.2d 1294, 1299 (7th Cir. 1984) (First Amendment "does not remove a business engaged in the communication of information from general laws regulating business practices").

10.    Plaintiffs cite to Justice White's concurrence in *Lowe* to claim that occupational licensing of persons who speak to their customers should be limited to persons who are in the "speaking professions," such as lawyers, doctors, or other fiduciaries to their clients.  This approach presses both Justice White's concurrence in *Lowe* and Justice Jackson's concurrence in *Collins* well beyond their bounds.

11.    Running a business is conduct, not speech, even when what one sells to the customer is information.  *See, e.g.*, *Graff v. City of Chicago*, 9 F.3d 1309, 1315 (7th Cir. 1993) (constructing and operating a newsstand was conduct, not speech); *Wang v. Pataki*, 396 F. Supp.2d 446, 455 (S.D.N.Y. 2005) (rejecting First Amendment challenge by "apartment

information vendor," because government can license occupations, and "under plaintiff's theory, any adverse action based on an unlicensed practice of a profession would be transformed into a prior restraint").

12.     The City has an interest in the competence of people who engage in business within its borders, and can create a licensing requirement to address that interest.  *See Collins*, 323 U.S. at 545 (Jackson, J.) (state can create licensing scheme for a vocation to address concerns about  "the incompetent" or "the irresponsible"); *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 625 (1995) (local government can implement licensing for practitioners and professions to address valid state interests).

13.     This principle applies even if the person imparting information to a customer is not a fiduciary to that customer, such as a tour guide.  *See, e.g.*, *Collins*, 323 U.S. at 544 (labor organizer); *Wang*, 396 at 455 (apartment information vendor); 63 P.S. § 551 (barbers); 63 P.S. § 455.591 (time share salesperson); Philadelphia Code § 9-623(2) (bicycle courier services). Indeed, this principle applies even where the business involves the sale of "core speech."  *See, e.g.*, *Gasparo v. City of New York*, 16 F. Supp.2d 198, 208-09 (E.D.N.Y. 1998) (upholding license requirement that required newsstand concession owners to meet a standard of "fitness," which included proof of financial resources, technical qualifications, experience, satisfactory record of performance, and a satisfactory record of business integrity).

14.     What the City's Tour Guide Ordinance does is create a minimum competency requirement for tour guides.  *See, e.g.*, Section 9-214(1) (purpose of ordinance); § 9-214(5) (continuing education and training).  This sort of professional or occupational licensing requirement is something that the City is entitled to do, and is well within the bounds of the First Amendment.

15.     The Tour Guide Ordinance is rationally related to the City's legitimate interests in promoting competence among its tour guides, and the City's significant interests in preserving its history and promoting its tourism industry.  *See, e.g.*, *Eatough v. Albano*, 673 F.2d 671 (3d Cir.

1982); *see also Globe Newspaper Co. v. Beacon Hill Architectural Commission*, 100 F.3d 175, 187-88 (1ˢᵗ Cir. 1996) (city had significant interest in historic preservation).

16.     Another indication of the reasonableness of the Tour Guide Ordinance is that its requirements are comparable to or less stringent than tour guide licensing requirements enacted in other historic cities, such as New York, Savannah, Charleston, New Orleans, and Williamsburg.

### b. The Tour Guide Ordinance is Content Neutral and Does Not Restrict Plaintiffs' Speech.

17.     Plaintiffs also claim that the Tour Guide Ordinance is content-based.  This contention is also incorrect.  The Tour Guide Ordinance is content-neutral, because the Tour Guide Ordinance does nothing to dictate what tour guides might or might not say on their tours. *Compare National Association for the Advancement of Psychoanalysis v. California Board of Psychology*, 228 F.3d 1043, 1055-56 (9ᵗʰ Cir. 2000) (professional licensing requirement was content-neutral and did not "restrict" speech where it did not regulate communication between psychologists and patients) *with Riley v. National Fed'n of the Blind*, 487 U.S. 781, 801 (1988) (commercial licensing laws that compelled fundraisers to make certain statements violated the First Amendment).

18.     Plaintiffs also claim that the Tour Guide Ordinance is content-based because it applies only to persons who lead tours relating to history and geography.  This contention misconstrues the scope of the Ordinance, because the Ordinance also applies to "places of interest" in the Center City Tourist area.  Section 9-214(1) & (2)(e).

19.     Another indication of the Tour Guide Ordinance's content-neutrality is that the Tour Guide Ordinance does not have a direct and substantial effect on whatever information tour guides may choose to impart to their customers.  *See, e.g.*, *Riley*, 487 U.S. at 801 & n.13 (government could license fundraisers under Justice Jackson's formulation in *Collins*, First Amendment problem arose through unlimited time frame in regulation); *see also Pleasant Grove*

*City v. Summum*, 2009 U.S. Lexis 1636 (U.S. Feb. 25, 2009) at *38-39 (Breyer, J., concurring) (court looks to whether "a government action burdens speech disproportionately in light of the action's tendency to further a legitimate government objective.").

20.     Plaintiffs also claim that the Tour Guide Ordinance improperly restricts their speech.  The Tour Guide Ordinance does not restrict plaintiffs' speech; it regulates who may engage in the tour guide business in the City for a fee.  *See National Association*, 228 F.3d at 1056-57; *cf. Smith v. City of New Orleans*, 2006 U.S. Dist. Lexis 4482, at *11, *17-*20 (E.D. La. 2006) (upholding "buffer zone" and solicitation ban imposed on walking tour guides in New Orleans' French Quarter, where "the plaintiffs' opportunity to express ideas through the tours has not been greatly impacted, nor has the content of the tours been affected by the passage of the ordinance"); *Washington Tour Guides Ass'n v. National Park Service*, 808 F. Supp. 877, 880 (D.D.C. 1992) (prohibition on D.C. tour companies providing tour guide services or soliciting business on national park grounds without a permit was permissible under the First Amendment, even though park service chose to grant permit to only one company, because government had not "banned" that commercial activity, it was enforcing neutral regulation regarding that activity).

21.     Further, Justice White's and Justice Jackson's concurring opinions indicate that where there is a "personal nexus" between a person wanting to practice a particular vocation or profession, and that person's customer, and that nexus is combined with a valid regulatory interest, regulation of a profession or vocation is not licensing of "the press" or "speech per se." *See, e.g.*, *Lowe*, 472 U.S. at 229, *citing Collins*, 323 U.S. at 547.  Using this formulation, and given that tour guides have personal contact with their customers, and the City's interests are significant ones, the Tour Guide Ordinance is an economic regulation of a vocation, rather than licensing of "speech" or "the press."

22.     Therefore, *Taucher v. Born*, 53 F. Supp.2d 464 (D.D.C. 1999), and *For Sale by Owner v. Zinneman*, 347 F. Supp. 868, 876-78 (E.D. Ca. 2004), on which plaintiffs rely, are distinguishable from this case.  The commodity trading advisors in *Taucher* "never [had] any

personal contact" with their customers, and as such, regulation by the government of their publications (newsletters, books, manuals) was akin to a speech regulation. *See id.* at 477; *Taucher v. Hruska*, 396 F.3d 1168, 1170 (D.C. Cir. 2005); *see also In re Scott Paper Securities Litigation*, 145 F.R.D. 366, 369 (E.D. Pa. 1992) (publishers of investment periodicals with a "regular circulation to a general population" and where there was no personal contact between buyers and publishers, publications were "the press" for First Amendment purposes). Similarly, the web site in *For Sale By Owner* served as a site for listings, much like a newspaper or other press entity, rather than a personal transaction or interaction. *See, e.g.*, *Wang v. Pataki*, 396 F. Supp.2d 446, 456 (S.D.N.Y. 2005) (individual contact between customer and apartment information vendor distinguished case from *For Sale by Owner*, given that web site hosted other transactions and served as a media outlet).

23.     The Tour Guide Ordinance is also narrowly tailored, given that the City held hearings, convened a task force of persons inside and outside of the tour guide industry, and considered other alternatives, such as programs in other cities and a voluntary certification program. *See, e.g.*, *Globe Newspaper Co. v. Beacon Hill Arch. Comm'n*, 100 F.3d 175, 190-91 (1st Cir. 1991) (ban on newsracks in Beacon Hill Historic District on aesthetic grounds was narrowly tailored, where commission had calculated costs and benefits through a survey, report, and public hearings). While the City did not "implement or experiment with other alternatives" before finally choosing the ordinance that the City did choose to implement in the Center City Tourist Area; the City was not required to do so for purposes of narrow tailoring analysis. *See id.*; *Hop Publications, Inc. v. City of Boston*, 334 F. Supp.2d 35, 43-44 (D. Mass 2004) (upholding ban on newsracks on Back Bay architectural district for aesthetic and historical reasons, and finding that the ordinance in question was narrowly tailored).

### c. Plaintiffs' Challenge to the Time Frame for Grading the Exam Must Be Rejected.

24.     Plaintiffs also attack the City's time frame for grading the exam and claim they are improperly "silenced" by the Tour Guide Ordinance, citing to *Riley v. National Federation of the Blind*, 487 U.S. 781, 802 (1988) (criticizing "delay without limit" for decision).[2]

25.     On its face, the Tour Guide Ordinance provides for a monthly opportunity for an applicant to take the exam and be certified, as well as an opportunity to appeal that decision. Section 9-214(4).  This is a time frame that is comparable to, if not more generous than, the time limits set forth in other tour guide certification programs and is sufficient under *Riley*.  *See, e.g.*, 29 Charleston Code § 29-59(d) (exam given four times a year); 6 Savannah Code § 1514(a) (exam given at least once a year).

26.     *Riley* also provides that an "administrative regulation or interpretation" that sets a time limit for a decision suffices for First Amendment purposes.  *See Riley*, 487 U.S. at 802.

27.     The City has also stipulated that it will take, at most, two weeks for the exam to be graded.  This is a permissible time limit under the First Amendment.  *See id.*; *see also Riel v. City of Bradford*, 485 F.3d 736, 756-57 (3d Cir. 2007) (for sign permit determination, three part system of 30 days for initial application to be sent to committee; committee making recommendation to City Council within 30 days of its next monthly meeting; and City Council making actual decision at its next monthly meeting did not violate the First Amendment, given detailed factors to be considered).

### d. Plaintiffs' Challenge to the Educational Exemption Fails as Well.

28.     Plaintiffs also argue that the educational exemption places "unfettered discretion" in the hands of the City, and therefore violates the First Amendment.  This Court should reject this contention as well.

---

[2]Plaintiffs have conceded that the City's stipulation regarding the format of the written examination resolves their initial contention that the Ordinance provision for the written decision creates "unfettered discretion" to determine the length of the exam.

29.     Section 9-214(4)(g) provides that a tour service company that has an "educational program" for evaluating and instructing tour guides may apply for an exemption from the written exam requirement.  Both tour guide companies that employ more than one tour guide and self-employed tour guides may apply for the educational exemption.[3]

30.     Exemptions for equivalent training and education are neither "unusual or irrational" in that context of professional or occupational licensing.  *See National Ass'n for the Advancement of Psychoanalysis v. California Board of Psychology*, 228 F.3d 1043, 1052 (9th Cir. 2000) (exemption for "research psychoanalyst" from licensing statute for psychologists); *see also* 22 Pa. Code § 133.7 (librarians or library assistants with equivalent certificates from other states and countries may be certified without having to pass a written exam, upon application to the State Librarian); 3 P.S. § 510.1 (waiver of educational requirements for cosmetologists); 29 Charleston Code § 29-63 (exemption from exam for tour guides); Williamsburg Code § 9-333 (tour guide educational requirement or "equivalent").

31.     Even in First Amendment cases, a city department or commission is allowed to use some measure of discretion and decisionmaking so long as the decision making at issue involves a discrete set of subjects and criteria.  *See, e.g.*, *Riel v. City of Bradford*, 485 F.3d 736, 756 (3d Cir. 2007) (historic architectural review board did not exercise "unbridled discretion" where that discretion was limited to consideration of structural design, material composition, appearance, and size of similar media from historical architectural period); *see also G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1082-83 (9th Cir. 2006) (upholding sign permit ordinance allowing City to take into account whether, among other design criteria, sign was "compatible with the surrounding environment" given "reasonable subjectivity" of the design review process).

---

[3]The Tour Guide Ordinance's definition of "tour service company" includes sole proprietorships as well as companies that employ more than one guide.  Section 9-214(2)(f).  The City also has stipulated that the exemption applies to individual tour guides as well as companies that employ more than one guide, so any potential claim that the educational exemption improperly distinguishes between individual tour guides and companies must be rejected as well.

32.     The City has not yet promulgated regulations for the exemption, but even so, the Ordinance on its face provides for a set of criteria that directs the department to look to ascertainable factors to determine whether an applicant is entitled to the exemption; this is not "unfettered discretion."  *See, e.g.*, *Gasparo v. City of New York*, 16 F. Supp.2d 198, 209-10. Here, an applicant for an exemption must submit in writing a description of an "educational program" in place (or completed) that addresses the subjects that form the basis for the written exam:  local geography, history, historic sites, historic structures, historic objects, and places of interest in the Center City Tourist Area.  Section 9-214(1); § 9-214(2)(a); § 9-214(4); § 9-214(g). This exemption scheme is "undoubtedly flexible," and the officials implementing the will exemption will exercise some discretion, but "perfect clarity and precise guidance have never been required, even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).

33.     Further, to declare the educational exemption facially unconstitutional because the City has not yet worked through all of the particulars of the exemption would be a premature constitutional ruling by this Court.  *See Washington State Grange v. Washington State Republican Party*, 128 S. Ct. 1184, 1193 (2008); *Crawford v. Marion County Election Board*, 128 S. Ct. 1610, 1622 (2008) (same).


**e.     Plaintiffs' Challenge to the Insurance Requirement Also Fails.**

34.     Plaintiffs also assert that the insurance requirement violates the First Amendment because it is content-based.  This Court has set forth *supra* why the Tour Guide Ordinance is not content-based, and why it is a regulation of conduct and business, not speech.  The same rationales apply to this challenge as well, and this contention must also be rejected.

35.     The Tour Guide Ordinance provides that an applicant for a tour guide certificate should provide proof of general liability insurance, whether obtained by an employer or for himself, if self-employed, in an amount determined by the City's Office of Risk Management. *See* Section 9-214(3)(.5).

36.     The City can and does place insurance requirements on entities that haul or direct persons and items in the City, whether as a general consumer protection matter or to address the City's own concerns about liability.  *See, e.g.*, Philadelphia Code § 9-403(2)(c) (private motor buses); § 9-402(3)(a) (animal drawn carriages); § 9-604(8)(d) (waste collection vehicles); § 9-604(3)(c) (towing vehicles); § 9-708 (compulsory vehicular amusement devices).

37.     The City also requires other certified professions/occupations to obtain insurance, again to address consumer protection and liability concerns.  *See, e.g.*, § 9-1302 (home inspectors); § 9-1003(5) (plumbers); § 9-1004(4) (contractors).

38.     These regulatory interests remain legitimate and constitutional even if what is being sold by a regulated business is considered "core speech" under the First Amendment.  *See, e.g.*, *Jacobsen v. Harris*, 869 F.2d 1172, 1173 (1989) (rejecting newspaper publisher's challenge to City's liability insurance requirement for newsracks, given that other entities had to comply with the same requirement).   That is the case here as well.


### 2.     Plaintiffs' Substantive Due Process and Equal Protection Claims Also Fail.

39.     Plaintiffs also claim that the Tour Guide Ordinance violates their substantive due process and equal protection rights.  These claims also fall short.

40.     The Supreme Court has made plain that the "generalized due process right to choose one's field of private employment . . . is nevertheless subject to reasonable government regulation. *See Connecticut v. Gabbert*, 526 U.S. 286, 292 (1999).

41.     A local government may impose professional education requirements, such as the Tour Guide Ordinance; such requirements are consistent with Due Process Clause.  *See Graves v. Minnesota*, 272 U.S. 425, 428-29 (1926).

42.     Furthermore, the Third Circuit has held that the doctrine of substantive due process rights does not extend to employment.  *See, e.g., Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396 (3d Cir. 2000); *see also Nicholas v. Pennsylvania State*

*University*, 227 F.3d 133, 142-43 (3d Cir. 2000). Therefore, this Court should reject plaintiffs' substantive due process claims.

43.     Plaintiffs' equal protection claims meet a similar fate because the Tour Guide Ordinance is rationally related to the City's legitimate interests in promoting professionalism and competence among tour guides who practice within its borders. *See, e.g., Eatough v. Albano*, 673 F.2d 671 (3d Cir. 1982) (upholding M.D. licensing requirements from equal protection challenge by osteopath, or D.O.).

44.     In sum, plaintiffs have not demonstrated actual success on the merits of their claims.


**D.     The City Will Be Harmed if the Court Grants a Permanent Injunction, and Any Injunction Would Not Be In the Public Interest.**

45.     Once the City establishes an exam and certification process, the City should be allowed to enforce the ordinance.

46.     The City has significant interests in preserving its history and promoting and enhancing its tourism industry.

47.     The City also has a legitimate economic interest in having competent and professional paid tour guides within its bounds.

48.     Not being allowed to put the Tour Guide Ordinance into place will affect the City's ability to address these interests and will not be in the public interest.


**E.     Conclusion.**

Wherefore, the City of Philadelphia respectfully requests that this Court deny Plaintiffs' Motion for a Permanent Injunction.

Respectfully submitted,

City of Philadelphia Law Department
Shelley R. Smith, City Solicitor

Date:  April 20, 2009

/s/ Elise Bruhl
By:  Elise Bruhl
Deputy City Solicitor, Appeals
Nicole Morris, Assistant City Solicitor
Law Department-Civil Rights Unit
1515 Arch Street, 14th Floor
Philadelphia, PA 19102
(215) 683-5446
Attorneys for Defendant
City of Philadelphia

## CERTIFICATE OF SERVICE

I hereby certify that on this date I caused Defendant's Proposed Findings of Fact and Conclusions of Law to be filed, via ECF, and is available for downloading and viewing:

TO:        Robert J. McNamara, Esq.
Institute for Justice
901 North Glebe Road, Suite 900
Arlington, VA 22203

Michael Berry, Esq.
Gayle C. Sproul, Esq.
Levine Sullivan Koch & Schulz, LLP
2112 Walnut Street, Third Floor
Philadelphia, PA 19103

Honorable Jan E. DuBois
United States District Court
Room 12613, U.S. Courthouse
601 Market Street
Philadelphia, PA 19106

By: /s/ Elise Bruhl
Elise Bruhl
Deputy City Solicitor, Appeals
City of Philadelphia Law Department

Date: April 20, 2009